IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

DALE ROBERTSON,

        Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 16-4688 (JBS)

**OPINION**

APPEARANCES:

Alan H. Polonsky, Esq.
Polonsky and Polonsky
512 S White Horse Pike
Audubon, NJ 08106
    Attorney for Plaintiff Dale Robertson

Gregg W. Marsano, Esq.
Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
P.O. Box 41777
Philadelphia, PA 19123
    Attorney for Defendant Commissioner of Social Security

**SIMANDLE**, District Judge:

## I. INTRODUCTION

This matter comes before the Court pursuant to 42 U.S.C. §
405(g) for review of the final decision of the Commissioner of
the Social Security Administration ("SSA") denying Plaintiff
Dale Robertson's ("Plaintiff") application for disability
benefits under Title II and Title XVI of the Social Security
Act, 42 U.S.C. § 401, et seq. Plaintiff, who suffers from

rosacea blepharitis, essential hypertension, obesity, type II diabetes, depression, post-traumatic stress disorder ("PTSD"), and panic disorder with agoraphobia, was denied benefits for the period beginning March 13, 2011, the alleged date of disability, to April 27, 2016, the date on which the Administrative Law Judge ("ALJ") issued a written decision.

In the pending appeal, Plaintiff argues that the ALJ's decision must be reversed and remanded on two grounds. Plaintiff contends: (1) the ALJ's finding that Plaintiff had a residual functional capacity ("RFC") to perform medium work, subject to certain limitations, was not supported by substantial evidence; and (2) the ALJ's determination that a significant number of alternative jobs existed in the national economy that Plaintiff was able to perform was not supported by substantial evidence. For the reasons stated below, the Court will affirm the ALJ's decision denying Plaintiff disability benefits.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed an application for disability insurance benefits on October 14, 2013, alleging an onset of disability beginning March 13, 2011. (R. at 21.) On February 12, 2014, the SSA denied the claim, and upon reconsideration on May 6, 2014. (R. at 21.) Hearings were held on December 2, 2015 before ALJ Jennifer Spector, at which Plaintiff appeared with counsel and

testified, and at which a vocational expert also testified. (R. at 21.) On April 27, 2016, ALJ Spector denied Plaintiff's appeal at step five of the sequential analysis, finding that Plaintiff could perform work as a presser, marker, or factory helper. (R. at 32.) The Appeals Council denied Plaintiff's request for a review and Plaintiff timely filed the instant action. (R. at 1-16.)

**B. Medical History**

The following are facts relevant to the present motion. Plaintiff was 54 years old as of the date of the ALJ Decision. (R. at 85.) Plaintiff completed two years of college and has an associate's degree in accounting. (R. at 48, 259.) He had previous work experience as a shift supervisor at a pharmacy, a realtor, and president of an outsourcing trucking company. (R. at 260.)

### 1. Physical Impairments

Plaintiff filed a claim for disability insurance benefits, alleging that he suffered from physical impairments, including type II diabetes, high blood pressure, high cholesterol, blurred vision in his left eye from rosacea, and light sensitivity. (R. at 258.)

On June 25, 2007, Plaintiff complained of left eye pain, which he had been experiencing off and on for seven years. (R. at 351.) After noting that Plaintiff had visual acuity of 20/200

in both eyes, Dr. Jennifer Resnick anesthetized Plaintiff's eye, "which made him feel much better." (R. at 351.) Dr. Resnick noted that Plaintiff had "multiple punctate uptake areas of the cornea." (R. at 351.) Plaintiff was prescribed eye ointment and discharged with instructions to follow up with a doctor in ophthalmology. (R. at 351.)

Plaintiff's next medical records come from April 23, 2012, when Dr. Alexander Higgins evaluated Plaintiff as a new patient. (R. at 440-44.) Plaintiff complained that his feet were tingling at night and that he had an ongoing problem with his left eye, in addition to issues relating to his mental health discussed below. (R. at 440.) Dr. Higgins reported that Plaintiff had not been on any medications, including those prescribed to him for diabetes and high blood pressure, for over one year. (R. at 440.) Upon examination, Plaintiff was not in acute distress, but his left upper eyelid and periorbital appeared "dry scaly." (R. at 440-41.) Dr. Higgins conducted a diabetes management exam, which appeared normal except that his toe nails were "too long." (R. at 441.) For his type II diabetes and benign hypertension, Dr. Higgins recommended diet and exercise and advised Plaintiff to start taking Lisnopril and Sertraline daily. (R. at 441-42.) Dr. Higgins also suggested that Plaintiff schedule an eye appointment. (R. at 443.)

Two days later, Plaintiff met with Dr. Humeera Hina. (R. at 434-39.) Plaintiff complained of cotton mouth, feeling weak, and frequent urination, but denied any chest pain, shortness of breath, heart palpitations, syncope, dizziness, or edema. (R. at 434.) Dr. Hina noted that Plaintiff had been taking his medication as prescribed but was "NOT doing the following: monitoring [blood pressure], monitoring home glucose, watching diet, and exercising." (R. at 434.) Upon inspection, Dr. Hina reported that Plaintiff's toenails looked normal. (R. at 435.) Dr. Hina ordered new tests and instructed Plaintiff to see an ophthalmologist, podiatrist, endocrinologist, and nutritionist, to keep a blood glucose log, to call every three days to report his blood sugar levels, to get labs, to exercise five days a week, and to follow-up in one week. (R. at 438.)

Plaintiff returned to Dr. Hina on May 9, 2012. (R. at 430-33.) At this appointment, Plaintiff informed Dr. Hina he was seeing an ophthalmologist and had scheduled an endocrinologist appointment for July. (R. at 430.) Plaintiff also notified Dr. Hina that he was eating better and no longer felt cotton mouth or tingling or numbness in his feet. (R. at 430.) Plaintiff had not started exercising yet and did not get a chance to do labs. (R. at 430.) Dr. Hina instructed Plaintiff to continue taking his medication and calling every three days to report the

results of his blood glucose log, and to follow-up in two weeks. (R. at 432-33.)

On May 16, 2012, Plaintiff returned to Dr. Hina reporting that he was "feeling pretty good/great" and that he was eating healthier and exercising more often. (R. at 426.) Dr. Hina advised Plaintiff that he should continue to work on his diet and see a nutritionist. (R. at 427.) Plaintiff also informed Dr. Hina that his vision was still blurry, but that he was seeing an ophthalmologist the following week. (R. at 426.) Dr. Hina told Plaintiff to follow-up again in three months. (R. at 429.)

The following month, Plaintiff returned to see Dr. Hina. (R. at 423-25.) At this follow-up appointment, Plaintiff told Dr. Hina he had started receiving unemployment compensation and was "feeling good." (R. at 423.) Plaintiff also reported that his appetite was good, but that he was trying to cut back. (R. at 423.) Dr. Hina recommended that he eat healthier, exercise more often, and to follow-up in two weeks. (R. at 425.)

On July 13, 2012, Plaintiff met with Dr. Maryam Khan for an evaluation and further management of his diabetes, hypertension, and hyperlipidemia. (R. at 455-56.) Dr. Khan assessed Plaintiff as having diabetes type II, poorly controlled, with elevated hemoglobin A1c of 13%. (R. at 455.) Dr. Khan recommended metformin at 500mg, twice a day, to help improve insulin resistance and Titrate up to 1 gram, twice a day. (R. at 455-

56.) Dr. Kahn also suggested that Plaintiff schedule an appointment with a diabetes educator to go over appropriate insulin injection technique and an appointment with Doctor Weigh to make lifestyle changes with respect to his hyperlipidemia. (R. at 456.)

On September 19, 2012, Plaintiff again met with Dr. Hina. (R. at 418-22.) Plaintiff explained he had not been taking his metformin, but Plaintiff had not taken because he was worried about his kidneys and wanted to discuss with Dr. Hina first. (R. at 418.) Feeling overwhelmed by having to check his sugar levels four times per day, Plaintiff had stopped keeping his blood glucose log the following month. (R. 418.) Plaintiff cancelled his last appointment with his ophthalmologist and had not scheduled another appointment with his endocrinologist. (R. at 418.) Plaintiff also stopped exercising. (R. at 418.) Dr. Hina encouraged Plaintiff to take the medication he had been prescribed, including the metformin, to go back to keeping a blood glucose log, to reschedule the appointments with his ophthalmologist and endocrinologist, to limit his fat intake, to exercise four times a week, to follow a diabetic diet, and to follow-up in two weeks. (R. 421.)

Plaintiff next returned to Dr. Hina on June 13, 2013. (R. at 412-16.) At this visit, Plaintiff that reported he had not seen the ophthalmologist or nutritionist, nor had he been

checking his blood sugars or keeping a blood glucose log. (R. 412.) Dr. Hina also noted that Plaintiff was "NOT doing the following: taking medications as prescribed, watching diet, and exercising." (R. at 412.) Dr. Hima conducted another diabetes management exam, which was normal except for thickened nails on one foot and nails that were too long on the other. (R. at 413.) Dr. Hina instructed Plaintiff to return to taking his medication, to see a nutritionist, endocrinologist, and ophthalmologist as soon as possible, and to follow-up in two weeks. (R. at 415-16.)

On June 26, 2013, Plaintiff went back to Dr. Hina for a follow-up appointment. (R. at 408-11.) Plaintiff was "doing good" and had scheduled appointments with a nutritionist, ophthalmologist, endocrinologist, and podiatrist for July. (R. at 408.) According to Dr. Hina, Plaintiff's "mood is good," and he had been taking medications as prescribed. (R. at 408.) Dr. Hina described Plaintiff's diabetes condition as "improving" and his benign hypertension as "unchanged." (R. at 409-10.) Dr. Hina instructed Plaintiff to continue monitoring his blood sugars, to keep his scheduled appointments, and to follow-up in four weeks. (R. at 410.)

On July 30, 2013, Plaintiff returned to Dr. Hina. (R. at 404-407.) Plaintiff informed Dr. Hina that, because he did not have a job and had lost his health insurance one month ago, he

decided to cancel all of his previously-scheduled appointments, except for the ophthalmologist appointment he had scheduled for the following day. (R. at 404.) Plaintiff explained that he was sleeping all day, did not leave the house or shave, and was unable to watch television because his eyes "get shaky." (R. at 404.) Dr. Hina noted that, although Plaintiff was taking medications as prescribed and watching his diet, he was not exercising. (R. at 404.) Dr. Hina further observed that Plaintiff's type II diabetes was "getting better" and that his benign hypertension was still "unchanged." (R. at 405.) Dr. Hina advised Plaintiff to limit his fat intake, to start walking and exercising, to continue taking his medication as prescribed, and to schedule a follow up visit in three months with Dr. Rakickas. (R. at 407.)

On October 27, 2013, Dr. Jeffrey Rakickas completed a "medical source statement," which assessed Plaintiff's ability to do work-related activities. (R. at 386-87.) Because Dr. Rakickas had never treated or interacted with Plaintiff, his report was based entirely on his interpretation of Dr. Hina's office notes. (R. at 386.) Based on these notes, Dr. Rakickas concluded that Plaintiff could only sit for 0-2 hours and stand for 1 hour in an 8-hour workday. (R. at 386.) Dr. Rakikas also determined that Plaintiff would likely be absent from work due to impairments and/or treatments for three or more days per

month. (R. at 387.) On the other hand, Dr. Rakikas concluded that Plaintiff's experience of pain or other symptoms was "never" severe enough to interfere with his attention or concentration and recommended only that he avoid noise at the workplace. (R. at 387.) Rakikas "never assessed" Plaintiff's ability to lift and carry or push and pull, as well as other "manipulative limitations." (R. at 386.)

Three days later, Dr. Rakickas met with Plaintiff for the first time. (R. at 398-402.) Plaintiff reported that he had been able to get out of the house the week before. (R. at 398.) Dr. Rakickas stressed the need for Plaintiff to make dietary changes and to set up a routine appointment with the ophthalmologist, (R. 400-401.) Dr. Rakickas also ordered lab work regarding Plaintiff's diabetes and hypertension. (R. at 400.)

On November 19, 2013, Plaintiff went back to see Dr. Rakickas. (R. at 392-96.) Dr. Rakickas observed that Plaintiff had been eating healthier, avoiding sugars and carbohydrates, and that his blood sugars were lower. (R. at 392.) Plaintiff reported having some urinary symptoms over the past several days, but those issues had been resolved. (R. at 392.) Plaintiff also complained of left flank pain, which Dr. Rakickas determined could be a possible kidney stone. (R. at 394.) Dr. Rakickas otherwise noted that there were "[n]o complaints today in the office" and that Plaintiff "[f]eels well." (R. at 392.)

Dr. Rakickas recommended that Plaintiff cut back on his nighttime insulin by two units per night and schedule appointments with a kidney doctor and podiatrist. (R. at 395.)

On December 26, 2013, Plaintiff met with Dr. Cheryl Mitchell, an ophthalmological consultant. (R. at 462-66.) Dr. Mitchell noted that Plaintiff "has an ocular history of Rosacea related blepharitis" and that he "complains that his left eyelashes 'rub and irritate my left eye.'" (R. at 462.) Dr. Mitchell recounted that Plaintiff had seen two other ophthalmologists in the past, one of whom had prescribed an ophthalmic ointment. (R. at 462.) Plaintiff's visual acuity was 20/30 in one eye and 20/40 in his other eye, and his near acuity was "Jaeger 3 right eye" without his glasses and "Jaeger 4 left eye" without his glasses. (R. at 462.) Dr. Mitchell further noted that Plaintiff had "a very apparent left ptosis upper eyelid with an upper and lower left eyelid entropion appearance," but that there was no retinopathy. (R. at 463.) Ultimately, Dr. Mitchell concluded "Left Eye: Superior lid artifact but otherwise normal." (R. at 463.) Dr. Mitchell recommended repair of his left ptosis and lower eyelid entropion and "aggressive management of his rosacea through topical treatment and or systemic doxycycline." (R. at 463.) Dr. Mitchell found that there is "no disability based upon vision alone." (R. at 463.)

Plaintiff visited Dr. Alexander Hoffman on January 21, 2014. (R. at 467-68.) Upon physical examination, Dr. Hoffman noted that Plaintiff was obese, had 20/25 acuity in his right eye and 20/50 acuity in his left eye, and had mild rosacea. (R. at 467.) Plaintiff otherwise appeared to be normal, had "excellent" straight leg raising, and could balance on either leg. (R. at 468.) Dr. Hoffman concluded that Plaintiff had slightly reduced visual acuity in his left eye due to rosacea, a normal gait and station, and no sensory or reflex deficit. (R. at 468.)

On July 28, 2014, Plaintiff started treatments with Dr. Sangita Doshi at Cooper Family Medicine due to issues with his medical insurance. (R. at 571-74.) Plaintiff reported that he did not check his blood sugars regularly and had not had bloodwork done in two years. (R. at 571.) Plaintiff also told Dr. Doshi that his "kidneys shut down on occasion," but that he "has never had this worked up." (R. at 571.) Dr. Doshi determined that Plaintiff's urinary disorder was more likely to be caused by urinary retention than a kidney problem and recommended that Plaintiff see an urologist. (R. at 574.) Dr. Doshi also instructed Plaintiff to start checking his home blood sugar. (R. at 574.)

On October 7, 2014, Plaintiff returned to Cooper Family Medicine, this time meeting with Dr. Nirandra Mahamitra. (R. at

568-70.) Dr. Mahamitra noted Plaintiff's chronic hypertension, but determined "[t]he problem is controlled." (R. at 568.) The results of Plaintiff's physical exam were otherwise normal. (R. at 569.) Dr. Mahamitra referred Plaintiff to Cooper Endocronology Associates to help address his uncontrolled diabetes. (R. at 570.) Dr. Manamitra also reminded Plaintiff to follow up with his ophthalmologist and podiatrist. (R. at 570.)

Plaintiff returned to Cooper Family Medicine on November 19, 2014, when he met with Dr. Marie Kairys. (R. at 565-68.) After finding out that his wife had been having a marital affair, Plaintiff became "very stressed out" and began smoking again. (R. at 566.) This caused his blood pressure to rise on occasion. (R. at 566.) Plaintiff reported "that he may occasionally get some chest pain and once in a while some tingling in his left arm." (R. at 566.) Plaintiff also complained that his kidneys "shut down on me" in the past. (R. at 566.) To that end, Plaintiff met with an urologist, but he had not yet seen a nephrologist. (R. at 566.) Dr. Kairys referred Plaintiff to Cooper University Nephrology and instructed Plaintiff to continue to monitor his blood pressure. (R. at 568.)

On December 8, 2014, Plaintiff met with Dr. Kairys again. (R. at 563-65.) This time, Plaintiff complained of a "sore throat that moved down into chest." (R. at 563.) Plaintiff

expressed concern that his wife had been trying to dose him with small amounts of heroin daily or poison him with Tylenol, but he was never tested for drugs and never called the police. (R. at 563.) Dr. Kairys recommended that Plaintiff contact the police if he believed he had been dosed and offered blood or urine testing. (R. at 565.) Dr. Kairys also prescribed Plaintiff medication for bronchitis. (R. at 565.)

On December 11, 2014, Plaintiff met with Dr. Jason Kline, a nephrologist. (R. at 472-74.) Plaintiff complained to Dr. Kline that he believed "Tylenol and Blistex lip balm shut his kidneys down" and that "his wife has been poisoning him and is concerned his kidneys are shutting down from this poison." (R. at 472.) Dr. Kline observed that Plaintiff smelled strongly of cigarettes, but otherwise appeared to be well. (R. at 473.) After reviewing Plaintiff's urinalyses and performing a CT abdomen, Dr. Kline diagnosed Plaintiff with chronic kidney disease, "stage II – controlled." (R. at 472-73.) Dr. Kline "suspect[ed] mild diabetic nephropathy given his uncontrolled diabetes and proteinuria" and advised Plaintiff to "work harder at controlling his diabetes, including dietary modifications and increasing physical activity to help lose weight." (R. at 473.)

On January 22, 2015, Plaintiff met with Dr. Mahamitra. (R. at 558-62.) Dr. Mahamitra noted that Plaintiff was still congested and coughing, but that he had not been taking the

medication that had been prescribed to him for bronchitis. (R. at 558.) Plaintiff also reported that he had not been exercising. (R. at 558.) The results of Plaintiff's physical exam were otherwise normal. (R. at 561.) Dr. Mahamitra recommended that Plaintiff stop smoking and counseled a heart healthy life style. (R. at 562.) Dr. Mahamitra also prescribed Mucinex for Plaintiff's chest congestion and Pravastatin for his dyslipidemia. (R. at 562.)

On May 28, 2015, Dr. Doshi examined Plaintiff. (R. at 553-58.) Plaintiff reported that he was eating better, cooking, walking nightly, sleeping well, and had deliberately lost 55 pounds since November, 2014. (R. at 554-55.) Dr. Doshi also observed that Plaintiff's balance and hyperlipidemia had improved and his diabetes were well-controlled. (R. at 556-57.)

Dr. Doshi examined Plaintiff again on July 15, 2015. (R. at 549-53.) This time, Plaintiff reported that he had been sleeping in his truck with his 27-year-old son and complained of pain in the neck area, right upper shoulder to elbow, and fingers. (R. at 549.) Dr. Doshi noted that Plaintiff was now exercising and weight lifting, but began feeling a sharp pain and numbness in his right hand and arm. (R. at 549.) Otherwise, Plaintiff was "feeling good." (R. at 549.) The following week, Plaintiff returned complaining of leg swelling and a rash, which he believed to be poison ivy. (R. at 544.) On examination, APN

Marna Seitz observed a rash on Plaintiff's calves. (R. at 547.)
Plaintiff was given a cream to help with the rash. (R. at 548.)

On November 15, 2015, Plaintiff returned to Dr. Doshi. (R. at 540-43.) Plaintiff reported that he was currently living with a married couple who had taken him and his son in. (R. at 540.) Plaintiff now claimed he had "kidney failure" and was instructed to be on dialysis in the past, but never got this done. (R. at 540.) Plaintiff told Dr. Doshi he had been smoking two packs of cigarettes per day for 18 years, but quit smoking in March 2015. (R. at 542.) Plaintiff complained of back pain and gait instability, but was otherwise assessed to be healthy. (R. at 543.) Dr. Doshi referred Plaintiff to the Cooper Bone & Joint Institute for the lower back pain and the Cooper Division of Neurology for the gait instability. (R. at 543.)

2.   Mental Impairments

Plaintiff's first medical records regarding his depression and anxiety come from his April 23, 2012 appointment with Dr. Higgins. (440-44.) According to Plaintiff he felt down at times, and had been on medication about twenty years ago. Plaintiff reported that he felt sad at times after losing his job, had anxiety, and felt his memory was not as sharp since he was having a hard time remembering names. (R. at 440.) Dr. Higgins prescribed Plaintiff Zoloft 25mg daily for one week, and then 50mg daily going forward. (R. at 442.)

Plaintiff next discussed mental health issues with Dr. Hina on May 2, 2012. (R. 430-33.) During this appointment, Plaintiff reported that he had been taking the Zoloft, but was still stressed and depressed. (R. at 430.) Dr. Hina noted that Plaintiff had just started the Zoloft and that the dosage would increase after a couple weeks. (R. at 431.) Dr. Hina advised Plaintiff to relax and take deep breaths, to be optimistic, and to rely on his wife for support. (R. at 432.)

On May 16, 2012, Plaintiff told Dr. Hina he was "feeling pretty good/great" and that he wanted to stay on Zoloft at the same dose. (R. at 426.) Dr. Hina noted that Plaintiff's anxiety and depression were "improved." (R. at 428.)

During a June 14, 2012 follow-up appointment with Dr. Hina, Plaintiff reported that his anxiety and depression had gotten worse. (R. at 423-25.) Specifically, Plaintiff told Dr. Hina that he was worried about his mother who had dementia and about his daughter getting back on his insurance, he was still having anxiety over losing his job, he was having trouble falling asleep, and he did not feel like getting out of bed because he lacked motivation. (R. at 423.) Plaintiff further reported that he had been depressed all of his life, but that it was recently "getting to him." (R. at 423.) Plaintiff denied feeling suicidal or homicidal and reported that his wife was very caring. (R. at 423.) Despite these issues, Plaintiff reported he was "feeling

good." (R. at 423.) Plaintiff had been taking Zoloft 50mg daily, but recently started taking 100mg per day. (R. at 423.) Dr. Hina recommended that Plaintiff increase his Zoloft intake to 100mg per day and stay on it, start seeing a psychologist and psychiatrist, eat healthy, be optimistic and think positive, to visit his mother, and to get out of bed even if he did not feel like it. (R. at 424.)

On September 19, 2012, Plaintiff met with Dr. Hina to obtain a refill on Zoloft, which had been "working for him." (R. at 418.) Dr. Hina again noted that Plaintiff's depression had "improved" and advised Plaintiff to continue taking Zoloft. (R. at 419.)

On June 12, 2013, Plaintiff again met with Dr. Hina. (R. at 412-16.) Plaintiff reported that his mother had passed away in April, that he was depressed, and that he had not been out of the house other than a few times. (R. at 412.) Dr. Hina increased Plaintiff's Zoloft prescription to 150mg per day. (R. at 416.) Two weeks later, Plaintiff reported that his "mood is good" and Dr. Hina noted that his depression was "improved." (R. at 408.)

On July 30, 2013, Plaintiff discussed his mental health with Dr. Hina. (R. at 404-407.) Plaintiff reported that he still did not have a job, was sleeping all day, did not leave the house, did not shave, was up all night, forgot things, and that

he still felt depressed. (R. at 404.) Notably, Plaintiff told Dr. Hina that he was "thinking of applying for disability." (R. at 404.) Dr. Hina increased Plaintiff's Zoloft prescription to 200mg per day. (R. at 407.)

As discussed above, Dr. Jeffrey Rakickas completed a medical source statement on Plaintiff's ability to do work-related activities on October 27, 2013. (R. at 386-87.) Based on Dr. Hina's office notes, Dr. Rakickas concluded that Plaintiff had "[s]evere depression and anhedonia precluding him from work – Not responsive to SSRIs at this time." (R. at 387.) Dr. Rakickas further noted that Plaintiff suffered from "severe depressed mood," "poor concentration," and "poor sleep." (R. at 387.)

When Dr. Rakickas met Plaintiff three days later, Plaintiff reported that his anxiety was "slightly better" and that he had been able to get out of the house the week before. (R. at 398.) Dr. Rakickas noted that Plaintiff's depression was "stable" and recommended that he continue taking the medication prescribed. (R. at 400.) When Plaintiff returned to Dr. Rakickas on November 19, 2013, Dr. Rakickas noted that Plaintiff's depression was "stable" and ordered him to continue taking his medication. (R. at 394.)

On November 7, 2013, Plaintiff was evaluated by Dr. P. Lawrence Seifer for a psychological disability. (R. at 388-91.)

Plaintiff complained of anxiety and depression resulting from the March 2011 robbery that led to his being fired. (R. at 388.) He further explained, "I feel like I'm letting everybody down," "I get attacks since August 2011, whenever I think about going out," "I shake and sweat," and "I tear up I get like light headed." (R. at 388.) Dr. Seifer noted that Plaintiff had never been a psychiatric in-patient, was not in therapy, and had been taking Zoloft. (R. at 388.) Plaintiff told Dr. Seifer he did not shop, he did not use public transportation, he did not do house work, he watched the news and read the newspaper, that he thought he was "fine" in social interactions, and that he "likes where he is" with respect to his ability to function independently. (R. at 389.) Dr. Seifer observed that Plaintiff cried when he spoke of the robbery and that his mood was "depressed and tearful." (R. at 389-90.) Plaintiff denied any suicidal or homicidal ideation. (R. at 390.) Dr. Seifer diagnosed Plaintiff with PTSD, dysthymic disorder, and panic disorder with agoraphobia and assessed him with a Global Assessment of Functioning ("GAF") score of 50. (R. at 390.) Finally, Dr. Seifer concluded that Plaintiff's "moderate/severe limitations are due to a combination of the physical and mental status and appear to be enduring." (R. at 390.)

On December 26, 2013, Plaintiff met with Dr. Mitchell to discuss his left eye issues. (R. at 462-66.) During this eye

evaluation, Dr. Mitchell recommended a psychological consultation for possible PTSD and further evaluation for depression and other psychological factors which "appear to make employment difficult for this claimant." (R. at 466.)

On July 29, 2014, Plaintiff told his new primary care provider, Dr. Doshi, that he had been off Zoloft for a year because his prescription had not been refilled between the switching of doctors, and that he did not want to restart it. (R. at 571.) Dr. Doshi recommended that Plaintiff see a therapist. (R. at 574.)

On November 19, 2014, Plaintiff told Dr. Doshi that his wife had been having a marital affair, which caused him great anxiety. In May 2015, Plaintiff returned to see Dr. Doshi, and explained that he had been separated from his wife since November 27, 2014 and was "[d]oing much better after [she] left." (R. at 553.) When Plaintiff met with Dr. Doshi on July 15, 2015, he reported that he was "feeling good," despite having recently divorced his wife and living out of his truck. (R. at 549.)

### 3.  Plaintiff's Activities

Plaintiff testified to the ALJ that he helps around the house, cooks, cuts coupons, and cleans up animal droppings in the backyard. (R. at 58.) Plaintiff testified he had some difficulty paying attention while driving (R. at 48), and that

he cannot concentrate long enough to read the sports section of the newspaper or watch television. (R. at 59.) According to Plaintiff, he does not leave the house often, except to drive his son to work and, "on good days," to get coffee. (R. at 27.)

Plaintiff lives in a house with his oldest son, his former co-worker, and another individual. (R. 46.) Plaintiff testified that he does not have difficulty climbing up the steps of his current house to the second floor. (R. at 46.) Prior to living in his current house, he was living in his truck for several months. (R. at 54.)

On March 13, 2011, Plaintiff was terminated from his most recent job as shift supervisor, for violating the pharmacy's policy while attempting to stop a store robbery. (R. at 49-50, 259.) Plaintiff then started collecting unemployment benefits while applying for new jobs. (R. at 51-52.) Sometime thereafter, Plaintiff stopped applying for jobs and he has not held a job since being terminated as shift supervisor. (R. at 259.)

### 4.  State Agency Consultants

Plaintiff's treatment records were reviewed by state agency physicians and psychiatrists in December of 2013 and January, February, and April of 2014. (R. at 76, 79-81, 108-114.)

In December 2013, Dr. Jan Jacobsen examined Plaintiff's medical records and prepared a mental residual functional capacity assessment. (R. at 79-81.) Dr. Jacobson determined that

Plaintiff had no understanding and memory limitations, but did have sustained concentration and persistence limitations. (R. 80.) Dr. Jacobson also opined that Plaintiff was not significantly limited in his ability to carry instructions, was moderately limited in his ability to maintain attention and concentration for extended periods and his ability to perform activities within a schedule, and was not significantly limited in his ability to sustain an ordinary routine without special supervision. (R. at 80.) Finally, Dr. Jacobson concluded that Plaintiff had social interaction limitations and should not deal directly with the public, but could sustain the basic demands associated with relating adequately to coworkers and supervisors within certain parameters. (R. at 81.) Dr. Joseph Wieliczko reviewed the updated records on April 30, 2014 and affirmed Dr. Jacobsen's opinion. (R. at 109-14.)

On January 5, 2014, Dr. Gary Spitz, a state agency medical consultant, reviewed Plaintiff's limited vision records and concluded that his visual impairments were non-severe. (R. at 76.) On February 6, 2014, Dr. Toros Shahinian reviewed Plaintiff's medical records and opined that the Plaintiff's diabetes, hypertension, and high cholesterol were non-severe. (R. at 76.) Dr. Caroline Shubeck reviewed the updated records on April 30, 2014 and affirmed the opinions of Dr. Spitz and Dr. Shahinian. (R. at 108-109.)

## C.  ALJ Decision

In a written decision dated April 27, 2016, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act at any time through the date of the decision because, consistent with his age, education, work experience, and RFC, he was capable of working as a presser, marker, or factory helper. (R. at 32.)

At the first stage of the five-step sequential evaluation process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 13, 2011, the alleged onset date of disability. (R. at 23.)

At step two, the ALJ determined that Plaintiff suffered from the following "severe impairments: rosacea blepharitis, essential hypertension, obesity, diabetes mellitus with diabetic nephropathy, obesity, depression, [PTSD], and panic disorder with agoraphobia." (R. at 23.) The ALJ found that Plaintiff's hyperlipidemia was not severe because it is "well-controlled with medication" and "the claimant has not alleged any limitations due to this impairment and the record does not contain any findings, which would support a limitation of his physical abilities due to this disorder." (R. at 24.) Further, the ALJ found that Plaintiff's alleged limitation due to neck and back pain were "non-medically determinable impairments" because "following complaints of lower back pain in November

2015, the claimant's primary care provider ordered a lumbar spine x-ray and referred to [sic] the claimant to the Cooper Bone and Joint Institute," but "the record does not contain evidence that the claimant followed through with the recommended treatment." (R. at 24.)

Despite recognizing Plaintiff's physical and mental impairments as severe, at step three, the ALJ concluded that Plaintiff's impairments did not meet, or equal in severity, any impairment found in the Listing of Impairments set forth in 20 C.F.R. Part 404. (R. at 24.) Specifically, the ALJ determined that Plaintiff had "mild restriction" in activities of daily living, "moderate difficulties" in social functioning, "moderate difficulties" with regard to concentration, persistence or pace, and no episodes of decompensation. (R. at 25.)

Between step three and step four, the ALJ determined that Plaintiff possessed the RFC to perform "medium work" that is:

> limited to occupations requiring no more than frequent near visual acuity; no exposure to bright or flickering lights as found in metal cutting or welding; no outdoor work; and can understand and remember simple instructions in order to carry out simple repetitive tasks with only occasional exposure to the general public.

(R. at 26.) Although the ALJ found that Plaintiff's physical and mental impairments "could reasonably be expected to cause the alleged symptoms," she found Plaintiff's statements concerning the intensity, persistence and limiting effects of these

symptoms "are not entirely consistent with the medical evidence and other evidence in the record." (R. at 27.)

Based on written responses to interrogatories sent to a vocational expert, the ALJ ultimately determined at steps four and five that, although Plaintiff is unable to perform any past relevant work, there are jobs that exist in significant numbers in the national economy that he can perform, including those of presser, marker, and factory helper. (R. at 31-32.)

## III. STANDARD OF REVIEW

This Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The Court's review is deferential to the Commissioner's decision, and the Court must uphold the Commissioner's factual findings where they are supported by "substantial evidence." 42 U.S.C. § 405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Cunningham v. Comm'r of Soc. Sec., 507 F. App'x 111, 114 (3d Cir. 2012). Substantial evidence is defined as "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 400 (1971); Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012) (using the same language as Richardson). Therefore, if the ALJ's findings of fact are supported by substantial evidence, the reviewing court is bound by those findings, whether or not it would have made the same

determination. *Fargnoli*, 247 F.3d at 38. The Court may not weigh the evidence or substitute its own conclusions for those of the ALJ. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). Remand is not required where it would not affect the outcome of the case. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).

## IV. DISCUSSION

### A. Legal standard for determination of disability

In order to establish a disability for the purpose of disability insurance benefits, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Plummer v. Apfel*, 186 F.3d 422, 426 (3d Cir. 1999); 42 U.S.C. § 423(d)(1). A claimant lacks the ability to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Plummer*, 186 F.3d at 427–428; 42 U.S.C. § 423(d)(2)(A).

The Commissioner reviews claims of disability in accordance with the sequential five-step process set forth in 20 C.F.R. § 404.1520. In step one, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity." 20
C.F.R. § 1520(b). Present engagement in substantial activity
precludes an award of disability benefits. See Bowen v. Yuckert,
482 U.S. 137, 140 (1987). In step two, the claimant must
demonstrate that the claimant suffers from a "severe
impairment." 20 C.F.R. § 1520(c). Impairments lacking sufficient
severity render the claimant ineligible for disability benefits.
See Plummer, 186 F.3d at 428. Step three requires the
Commissioner to compare medical evidence of the claimant's
impairment to the list of impairments presumptively severe
enough to preclude any gainful activity. 20 C.F.R. § 1520(d). If
a claimant does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and five.
Plummer, 186 F.3d at 428. Step four requires the ALJ to consider
whether the claimant retains the ability to perform past
relevant work. 20 C.F.R. § 1520(e). If the claimant's
impairments render the claimant unable to return to the
claimant's prior occupation, the ALJ will consider whether the
claimant possesses the capability to perform other work existing
in significant numbers in the national economy, given the
claimant's residual functional capacity, age, education, and
work experience. 20 C.F.R. § 1520(g); 20 C.F.R. 404.1560(c).

**B.    Substantial evidence supports the ALJ's findings regarding Plaintiff's residual functional capacity**

Plaintiff first argues that the ALJ erred between steps three and four when she found that Plaintiff had an RFC to perform medium work, subject to certain limitations. (Pl. Br. at 15.) According to Plaintiff, such a finding was not supported by substantial evidence. (Pl. Br. at 15.) Specifically, Plaintiff claims that the ALJ incorrectly gave "great weight" to the opinion of a single psychological, non-examining state agency doctor with respect to Plaintiff's mental condition and that "no doctors who opined on the Plaintiff's physical condition were given any significant weight." (Pl. Br. at 17.) Plaintiff also complains that the ALJ improperly dismissed the opinions of Dr. Rakickas and Dr. Seifer. (Pl. Br. at 18-20.)

SSR 96-8p dictates that the RFC assessment be a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." In order to meet the requirements of SSR 96-8p, the ALJ "must specify the evidence that he relied upon to support his conclusion." Sullivan v. Comm'r of Soc. Sec., No. 12-7668, 2013 WL 5973799, at *8 (D.N.J. Nov. 8, 2013). Moreover, the ALJ's finding of RFC must be "accompanied by a clear and satisfactory explanation of the basis on which it rests." Fargnoli, 247 F.3d

at 41 (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 2011)).

It is well established that "the ALJ - not treating or examining physicians or State agency consultants - must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c)). Furthermore, while an ALJ must consider the opinions of treating physicians, "[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity" where it is not well supported or there is contradictory evidence. Chandler, 667 F.3d at 361 (alteration in original) (quoting Brown v. Astrue, 649 F.3d 193, 197 n.2 (3d Cir. 2011)); see also Coleman v. Comm'r. of Soc. Sec. Admin., 494 Fed. App'x. 252, 254 (3d Cir. Sept. 5, 2012) ("Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason.") (quoting Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)).

When a conflict in the evidence exists, the ALJ retains significant discretion in deciding whom to credit. Plummer, 186 F.3d at 429. The ALJ is entitled to weigh all evidence in making its finding, and is not required to accept the opinion of any medical expert. Astrue, 649 F.3d at 196. In discounting

evidence, the ALJ must give a clear explanation for why it is doing so. Plummer, 186 F.3d at 429; Cotter, 642 F.2d at 704-05.

Up front, the Court disagrees with Plaintiff's contention that "no doctors who opined on the Plaintiff's physical condition were given any significant weight." (Pl. Br. at 17.) In determining Plaintiff's RFC, the ALJ carefully considered all available medical records reflecting the opinions of several doctors who examined Plaintiff or reviewed Plaintiff's medical records between 2007 and 2015. (See R. at 26-31.) As discussed above, the opinions considered by the ALJ include those of Dr. Higgins, Dr. Hina, Dr. Khan, Dr. Hoffman, Dr. Rakickas, Dr. Doshi, Dr. Mahamitra, Dr. Kairys, and Dr. Kline. The ALJ only rejected the opinions of three state agency medical consultants who concluded that Plaintiff's physical impairments were non-severe, instead finding that "evidence received at the hearing [] supports a finding of severe impairments." (R. at 30.) Substantial evidence supports this decision.

Plaintiff also takes issue with the fact that the ALJ only gave "great weight" to the psychological opinion of a single non-examining state agency doctor, Dr. Jacobsen. (Pl. Br. at 17.) But Plaintiff overlooks the fact that the ALJ only did so after specifically finding that Dr. Jacobsen's opinions "are supported by the limited objective mental health evidence and limited treatment, and consistent with the record as a whole,

including the claimant's subjective complaints and reported activities of daily living." (R. at 30.) Thus, the ALJ did not simply take Dr. Jacobsen's opinions at face value; she compared Dr. Jacobsen's opinions to all available medical records and to Plaintiff's own testimony, as she is permitted to do. Even Dr. Seifer's mental status examination, which is the most favorable psychological opinion from Plaintiff's perspective, "revealed nothing more than a depressed and tearful mood with an appropriate affect, good attention and concentration, intact memory skills, and good social judgment." (R. at 31.) The ALJ's reliance on Dr. Jacobsen's opinion in assessing Plaintiff's mental impairments is thus supported by substantial evidence.

Next, Plaintiff argues that the ALJ improperly discounted the October 27, 2013 opinion of Dr. Rakickas, in which Dr. Rakickas concluded that Plaintiff "was unable to sit more than 0-2 hours, and stand for no more than 1 hour in an 8 hour work day." (Pl. Br. at 19.) The ALJ properly noted that Dr. Rakickas had not examined Plaintiff prior to preparing this report and nothing in Dr. Hina's records, which Dr. Rakickas relied exclusively upon, supported some of Dr. Rakickas's findings, including his recommendation that Plaintiff should avoid loud noises at work. (R. at 29.) Indeed, when Dr. Rakickas actually examined Plaintiff in the following days and weeks, he observed no physical limitations. (R. at 398-402.) The ALJ's decision to

assign Dr. Rakickas's first opinion "little weight" is well supported by the evidence in the record.

Plaintiff further contends that the ALJ failed to provide a "substantive discussion" regarding Dr. Seifer's findings that Plaintiff "suffered from [PTSD], dysthymic disorder, and panic disorder with agoraphobia, and found the severity to be consistent with a GAF score of 50." (Pl. Br. at 18.) Not so. The ALJ specifically addressed Dr. Seifer's examination report and described Dr. Seifer's diagnoses of Plaintiff's PTSD and depression. (R. at 28.) In fact, the ALJ actually found that all of Dr. Seifer's previously referenced diagnoses were "severe" impairments. (R. at 23.) The ALJ also directly addressed Plaintiff's GAF score of 50. As the ALJ explained, a GAF of 50 is normally "indicative of serious symptoms or any serious impairment in social, occupational, or school functioning," but a GAF score is "only a snapshot at a point in time, often based on inadequate evidence of the claimant's condition and treatment course." (R. at 30.) Indeed, the American Psychiatric Association eliminated the use of the GAF scale in 2013, noting its "conceptual lack of clarity" and "questionable psychometrics in routine practice." (R. at 30 n. 2.) But even if Plaintiff's GAF score of 50 were fully credited, it is possible he "could perform some substantial gainful activity." Hillman v. Barnhart, 48 F. App'x 26, 30 n.1 (3d Cir. 2002). Thus, the ALJ's treatment

of Dr. Seifer's psychological disability evaluation and decision to assign little value to Plaintiff's GAF score is supported by substantial evidence in this record.

For all of these reasons, substantial evidence supports the ALJ's finding that Plaintiff had the RFC to perform the full range of medium work:

> except limited to occupations requiring no more than frequent near visual acuity; no exposure to bright or flickering lights as found in metal cutting or welding; no outdoor work; and can understand and remember simple instructions in order to carry out simple repetitive tasks with only occasional exposure to the general public.

(R. at 26.)

**C. Substantial evidence supports the ALJ's findings regarding whether there were a significant number of alternative jobs that Plaintiff was able to perform**

Plaintiff next argues that the ALJ erred at step five by relying on vocational expert testimony that was based on an erroneous RFC[1] and by improperly concluding that the alternative jobs listed were "consistent with a worker being limited to simple, repetitive tasks that can be learned with no more than simple instruction." (Pl. Br. at 23.)

In assessing a claimant's application for benefits, the ALJ is required to: (1) ask, on the record, whether a vocational expert's testimony is consistent with the Dictionary of

_____

[1] For the reasons discussed above, the Court finds that the RFC was based on substantial evidence. Accordingly, the Court need not address this argument a second time.

Occupational Titles[2] ("DOT"); (2) elicit a reasonable explanation where any inconsistency appears, and (3) explain in its decision how the conflict was resolved. Zirnsak v. Colvin, 777 F.3d 607 (3d Cir. 2014); see also Burns v. Barnhart, 312 F.3d 113, 117 (3d Cir. 2002) (explaining that, where there is a conflict, an explanation must be made on the record and the ALJ must explain in his decision how the conflict was resolved). The Third Circuit has emphasized that the presence of inconsistencies does not mandate remand, so long as "substantial evidence exists in other portions of the record that can form an appropriate basis to support the result." Zirnsak, 777 F.3d at 617 (quoting Rutherford v. Barnhart, 299 F.3d 546, 557 (3d Cir. 2005)).

Here, the ALJ asked a vocational expert, via interrogatory, whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and RFC. (R. at 336.) As reflected in the ALJ's report, the ALJ determined that Plaintiff had the ability to "understand and remember simple instructions in order to carry out simple repetitive tasks with only occasional exposure to the general

---

[2] The Dictionary of Occupational Titles is a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy. Burns v. Barnhart, 312 F.3d 113, 119 (3d Cir. 2002).

public." (R. at 26.) This was consistent with the interrogatory posed to the vocational expert. (R. at 336.)

In response to the ALJ's interrogatory, the vocational expert listed three unskilled positions that could be performed by an individual with Plaintiff's RFC (presser, marker, and factory helper), as well as the number of jobs that exist in the national economy for each. (R. at 337.) The vocational expert additionally confirmed there were no conflicts between her responses and the occupational information contained in the DOT (R. at 337), thereby satisfying the first Sirnsak factor.

As there are no apparent defects or conflicts in the vocational expert's testimony, substantial evidence supports the ALJ's determination that Plaintiff could perform work existing in the national economy.

## V. CONCLUSION

For all of these reasons, the Court finds that substantial evidence supports the ALJ's decision to deny Plaintiff benefits, and that it should be affirmed. An accompanying Order will be entered.

 **September 28, 2017** 　　　　　　　 **s/ Jerome B. Simandle**
Date　　　　　　　　　　　　　　 JEROME B. SIMANDLE
　　　　　　　　　　　　　　　　 U.S. District Judge